**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

JESSORE MANAGEMENT SA,

                            Plaintiff,                               20 Civ.

      -against-

                                                     **COMPLAINT**

BRIT SYNDICATE 2987,

                            Defendant.

-----------------------------------------------------------------------x

       Plaintiff, Jessore Management SA ("Jessore"), by and through its attorneys, as and for its complaint against defendant Brit Syndicate 2987 a/k/a BRT Syndicate and/or Brit Syndicates Limited of Lloyd's of London ("Brit"), alleges the following:

<b><u>INTRODUCTION</u></b>

       1.      Jessore claims against its insurer, Brit, for the March 2017 loss of its sailing catamaran, JESSEAS II, after its 97.4-foot carbon mast snapped, in rough seas and high winds, off the coast of Spain. At the time of accepting the risk and issuing its "all risks" insurance for the yacht's Euros €4,274,000 agreed value, Brit had been provided full particulars of JESSEAS II and unrestricted access to additional information, from its Captain as well as the shipyard, which had constructed the yacht and was at the end of the lengthy process of completing the "yard guaranty work" before final delivery to its owner. Consistent with custom and practice among yacht underwriters, Brit did not avail itself of the access to such additional information. Rather, it trusted the reputable shipyard, to ensure that the yacht would be in every respect seaworthy and safe for its intended round the world voyage. Despite admitting and paying Jessore's initial claims under the insurance, when Brit then discontinued in the business of insuring yachts, its approach changed to one of delaying and ultimately denying Jessore's claim,

based on a list of unfounded defenses, including, nondisclosure of the very facts which had been made available to Brit, but which were of no interest and not material to Brit, when agreeing to the broad insurance or when paying the initial claims. Extensive technical investigations have identified a few possible causes for Jessore's mast collapse. Whether due to faulty construction or the setting of the rigging, the possible causes identified are all clearly within the "all risks" insurance sold by Brit.

2.      Brit's conduct, as alleged below, has breached not only: (a) the terms of Jessore's insurance policy; but also (b) Brit's obligation of good faith and fair dealing.

## PARTIES

3.      Plaintiff Jessore Management SA ("Jessore") is a corporation duly organized and existing under the laws of the British Virgin Islands, with a principal office and place of business at Wickhams Cay I, Road Town, Tortola, British Virgin Islands.

4.      At the relevant time, Jessore became the owner of the "JESSEAS II," a new 2016 built, 22.7 meters, Series 7 model, 745 Privilege Marine Sailing Catamaran.

5.      On information and belief, at all relevant times, defendant Brit, is a Lloyd's insurance syndicate organized and existing under the laws of England & Wales with its principal place of business in London, United Kingdom. Brit is managed by Brit Syndicates Limited.

## JURISDICTION AND VENUE

6.      This action asserts claims under and relating to a marine insurance policy (the "Policy") and is therefore within the admiralty and maritime jurisdiction of this Court, pursuant to 28 U.S.C. § 1333 and as contemplated by Rule 9(h) of the Federal Rules of Civil Procedure.

7.      This action is pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

8.      An actual controversy of a justiciable nature exists between Jessore and Brit involving rights and obligations under the Policy, and depending on the construction of said contract, such controversy can be determined by a judgment of this Court without further suit.

9.      This Court has personal jurisdiction over Brit pursuant to the Service of Suit Clause of the Policy, Exh. 3, hereto; and Brit has expressly submitted to the jurisdiction of a court of competent jurisdiction within the United States of America, which includes this Court.

10.      At all relevant times, Brit underwrites, through United States agents and/or brokers, property, casualty and marine insurance policies, and collects premiums, throughout the United States, including in the State of New York

11.      Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because Brit has expressly agreed in the Policy's Service of Suit Clause that service of process for any claims arising out of the Policy may be served upon a law firm located within the Southern District of New York. Furthermore, at all relevant times, Brit through United States agents and brokers has done business within the district.

## THE MARINE HULL & LIABILITY POLICY

12. For good consideration, Brit issued the Policy to Jessore (policy no. B0901LH1722775000) which provided several categories of marine insurance for Jessore's yacht, the 2016 built, 22.7 meters, 7 Series Privilege Marine Sailing Catamaran, "JESSEAS II" and its crew, for a policy period of twelve months commencing from March 2, 2017 and ending March 2, 2018. A copy of what purports to be the Policy is attached as Exhibit 1.

### *The Policy Coverage*

13. The Policy's main "Section 1" and "Section 2" categories of insurance are described, on page 1, as follows:

> Section 1:
> Hull Machinery & Equipment; Protection & Indemnity, Medical Payments, Personal Accident and Uninsured Boaters.
>
> Section 2:
> Excess Liabilities including excess Uninsured Boaters Liabilities.
> Excess War and Strikes including War Protection and Indemnity Liabilities.

14. The Policy refers to and purports to incorporate numerous insurance forms, some partially and/or amended, as described on Policy pages 2 through 5.

15. The Policy, provided the broadest insurance for JESSEAS II, including, "all risks" insurance for "Hull Machinery & Equipment", for the agreed valued of €4,274,000 (the "Hull Insurance"), covering any and all losses, unless expressly excepted in Policy terms, limits and exclusions. Exh. 1, p. 1.

16. The Hull Insurance is also described in Section A of American Yacht Form R12 ("Form R12"), "Section A – Hull Insurance". Exh. 2, p. 2. (Form R12 is partially incorporated, as amended).

17.     Section A of Form R12 confirms that the Hull Insurance covers "ALL RISKS of physical loss or damage" up to the agreed value; which is payable among other things where JESSEAS II suffers a "constructive total loss" (defined as when "the expense of recovering and repairing the vessel shall exceed the amount of insurance on hull and machinery", which is to say, €4,274,000). Section A provides, in relevant part, as follows:

> SECTION "A" – HULL INSURANCE
> COVERAGE
> This insurance provided by this Section covers, subject to the exclusions and limitations of this Policy, against ALL RISKS of physical loss or damage to the property covered from any external cause, as well as physical loss or damage directly caused by fire, explosions, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull (excluding the cost and expenses of repairing or replacing any defective part), provided such loss or damage has not resulted from want of due diligence or intentional damage by the owners of the Yacht or by the Assured; provided always that the amount recoverable hereunder shall not exceed the amount of insurance.
>
> …
>
> VALUATION CLAUSE
> The said yacht, for so much as concerns the Assured by agreement between the Assured and the Assurers is and shall be valued at the amount stated under the heading "Agreed Valuation".
>
> …
>
> CONSTRUCTIVE TOTAL LOSS
> No recovery for a constructive total loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the amount of insurance on hull and machinery.
>
> …

(Capitalization in original).

18.     Form R12 is only applicable to the extent indicated in the Policy. Thus, in the Policy, Brit agreed to the deletion of several of the "exclusions" listed in Section A of Form R12. Exh. 1, p. 2. By deleting such exclusions, Brit affirmatively agreed to include in the Policy and to insure the risks, losses and events itemized in the deleted exclusions (which would otherwise have been excluded from the insurance).

19.     Among the five exclusions which Brit agreed to delete were Exclusions 4 and 7 of

Section A, below:

> EXCLUSIONS
> THIS INSURANCE DOES NOT COVER
> 1. Any loss or damage directly or indirectly caused by or resulting from wear and tear, gradual deterioration, inherent vice, marine borers, vermin or electrolysis.
> 2. Theft or mysterious disappearance of equipment or accessories, other than boats and launches and their motors, unless occurring in conjunction with theft of the entire yacht or unless there be visible evidence of forcible entry.
> 3. Any loss, damage or expense caused by or in consequence of ice and/or freezing.
> 4. *Any loss, damage or expense directly or indirectly caused by or in consequence of faulty construction and/or improper design.*
> 5. Any loss, or damage to electrical apparatus, including wiring, directly or indirectly caused by electricity, other than lighting unless fire ensues and then only for loss or damage by such ensuing fire.
> 6. Wages and/or provisions whether the average be particular or general.
> 7. *Mechanical breakdown or derangement of machinery.*
> 8. Any loss of use, demurrage or charter hire to the yacht insured hereunder.

(Emphasis added) Form R12, Section A, Exh. 2.

20.     By deleting such exclusions, Brit therefore affirmatively agreed to include within

the broad "all risks" insurance for JESSEAS II, the following risks, among others:

> 4. Any loss, damage or expense directly or indirectly caused by or in consequence of faulty construction and/or improper design.
>                             *   *   *
> 7. Mechanical breakdown or derangement of machinery.
>                             *   *   *

21.     While Form R12 contains other terms and another Section "E", the Policy, on

page 2, only refers to and incorporates Form R12, with Sections A through D, matching the

"Section 1" insurance, listed on page 1 of the Policy:

> "Conditions: American Yacht Form R12, with Section A ....D" [only Sections A through D as itemized].

Exh. 1, p. 2. No other term or section of Form R12 is referred to or incorporated into the Policy.

22.     The Policy insured the JESSEAS II for "Worldwide" navigation. *Id.*, p. 2.

***The Policy Choice of Law and Jurisdiction***

23.     The JESSEAS II was first insured for the prior policy year, from March 2, 2016 through March 2, 2017, under a Hull & Liability policy number B0621MMILYWY16061 underwritten by multiple underwriters, including, Brit (the "2016 Policy"). Brit had only underwritten 47% of the Hull Insurance (in contrast to 100% for the Policy, upon renewal), for which the JESSEAS II had the same agreed value of €4,274,000. The Policy, in the final versions later prepared by the London insurance broker, called JLT Specialty Ltd. in 2017 (f/k/a Millers, in 2016) provided for New York Law and jurisdiction, as follows for "Choice of law & Jurisdiction":

> Law:          New York
> Jurisdiction:  As per Institute Service of Suit Clause (USA) CL355
> 1/11/92

Exh. 1, p. 5.

24.     The Service of Suit Clause (USA) CL355 1/11/92 provides in relevant part:

> This insurance is subject to the Institute Service of Suit Clause (USA) CL 355 dated 1/11/92 as follows:
>
> It is agreed that in the event of the failure of the Underwriters severally subscribing this insurance (the Underwriters) to pay any amount claimed to be due hereunder, the Underwriters, at the request of the Assured, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America.
>
> …
>
> Subject to the Underwriter's rights set forth above:
>
> (a)     It is further agreed that the Assured may serve process upon any senior partner in the firm of: **Mendes & Mount (Attorneys), 750 Seventh Avenue, New York, N.Y. 10019-6829** and that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

A copy of the Service of Suit Clause is attached as Exhibit 3.

25.     The one-year time bar on page 1 of Form R12, is not referred to and is not incorporated into the Policy. Exh. 1, p. 2. The applicable time for suit, under New York law, is six years.

26.     Regardless of which law was indicated and approved, at the time of entering the contract for the Policy, the Policy as set forth in Exhibit 1, was issued in France, by Mior, the French employee of Monaco insurance broker, Ascoma Maritime Yacht Insurance, which was Brit's and Lloyd's agent for France and Monaco, and mailed to the French Captain on JESSEAS II, in France, which was beneficially owned by a French citizen and, at the time, was also based in France.

27.     At all relevant times, according to French insurance law, regulation and practice, the applicable time for suit against insurers is two years from issuance of the final report of the French court-appointed expert into the cause of the claimed loss under the Policy.

28.     Jessore will rely on all terms and conditions of its contract and Policy, as well as any insurance industry regulation and claims handling practices, as may ultimately be shown at trial to be applicable.

## BACKGROUND FACTS

29.     Jessore was formed in 2007, by its beneficial owner, Jean-Christian Gounon, to hold title to his first yacht, JESSEAS. Mr. Gounon, a French national, has sailed yachts for twenty years.

30.     Mr. Gounon's first sailing catamaran, the JESSEAS, had been manufactured for him by Alliaura Marine, a yard at Sables d'Olonne, on the French Atlantic coast. After some ten years, in 2014, when it came time for a new yacht, Mr. Gounon went back to the same yard

which, at the time, traded under the name Privilege Marine. Privilege Marine provided the same engineer and the same architect, who had designed and built the JESSEAS, as well as other Privilege 745 yachts.

31.     On July 10, 2014, Jessore therefore contracted with Privilege Marine for the construction of a Series 7 Privilege Marine Sailing Catamaran, a "Privilege 745" model, to be named JESSEAS II.

32.     The mast on the Series 7 was made of carbon (as opposed to aluminum, on prior models, such as the JESSEAS).

### *Brit's Ambition to be a Major Yacht Insurer and its Relaxed Underwriting Standards*

33.     At all relevant times, underwriters in the business of insuring private yachts, had low underwriting standards (compared to other areas of insurance) for the vessels and risks that they were willing to insure, in order to book the business and earn their premium.

34.     In or about December 2011, Brit employed John Higham, as its Senior Yacht Underwriter, to build up its business with the goal of becoming the major yacht underwriter at Lloyd's and in the London Market.

35.     In order to induce wealthy owners of private yachts to move to and/or keep their accounts with Brit, Brit relaxed even further its underwriting standards.

### PLACING INSURANCE WITH BRIT 2015-2016

36.     At all relevant times, it was the practice among underwriters specializing in insuring yachts, to insure newly built yachts, notwithstanding that on delivery, every yacht will have work that still has to be done by the manufacturer or shipyard (at times referred to as "yard guarantee work"), to make adjustments, resolve the numerous issues and to bring the yacht up to the required standard before the final sea trials.

37.   At all relevant times, such underwriters, including Brit, accepted the risk that a reputable manufacturer or shipyard would properly complete such guaranty work and would otherwise be responsible for any failure to do so.

38.   Insurance for JESSEAS II was procured on behalf of Jessore, through marine insurance broker, Nicolas Mior ("Mior"), of Ascoma Maritime Yacht Insurance ("Ascoma"), a "Lloyd's Agent" for France and Monaco.

39.   Mior approached the London yacht insurance market, via Emily Bryant ("Bryant") of Miller Insurance Services LLP ("Millers"), the placing broker for Brit.

40.   Mior sought insurance for both JESSEAS (in process of being sold) and JESSEAS II.

41.   Starting May 28, 2015, via brokers Ascoma (Mior) and Millers (Bryant), Jessore provided prospective London underwriters at Brit the particulars of both yachts and also advised: (a) that JESSEAS II was not a finished yacht, but would be a "new built"; (b) that the manufacturer was Privilege Marine (a well-known reputable manufacturer); (c) that the new model was the "Privilege 7 Series", of the 745 model catamaran; (d) that the mast was made of carbon (as opposed to aluminum); (e) that Jessore was going to receive "a new catamaran in July 2015" (a date repeatedly put back ultimately to March 2016); (f) that the value to be insured was €4,274,000; and (g) Jessore's intention to sail JESSEAS II across the Atlantic to navigate the Caribbean (requiring a hurricane plan for underwriters, due to the risk of hurricanes in that region).

42.   By certificate issued December 31, 2015, the classification society, Bureau Veritas, a World leader in testing, inspection and certification, issued its "EC Type Examination Certificate of Conformity" for JESSEAS II: (a) certifying regulatory compliance with essential

safety and other requirements for the design and construction of recreational craft; (b) annexing a very detailed description of JESSEAS II, a technical listing of all parts and drawings submitted; (c) concluding "[t]his sailing yacht fulfills the requirements of conformity to the essential requirements of the Recreational Craft Directive 94/25/CE as amended by Directive 2003/44/CE".

43.     A certificate issued January 25, 2016 (Déclaration Ecrite de Conformité), further certified the yacht's legal and regulatory compliance and identified JESSEAS II as a Privilege 7 Series catamaran.

44.     Full particulars of JESSEAS II and her certification were available to Brit's underwriters on line, had they been interested, which they were not.

45.     Ascoma and Mior, via Bryant and Millers, also provided Brit's underwriters a link to Privilege Marine's website: http://www.privilege-marine.com.

46.     Mr. Gounon, for Jessore, also instructed Mior that he should obtain any information regarding JESSEAS II required for insurance: (a) from the yacht's Captain, Thierry Calvet ("Captain Calvet") and/or (b) directly from Privilege Marine.

47.     Mior was in direct communication with Privilege Marine for documentation and/or information regarding JESSEAS II, which he passed along to Brit for the 2016 Policy.

48.     At all relevant times, Mior and Ascoma and Bryant and Millers were agents of Brit, with respect to information received or made available relating to JESSEAS II.

### *The First Policy Year Commencing March 2, 2016*

49.     The 2016 Policy provided insurance for twelve months, starting on March, 2, 2016.

50.     From March 6 through March 15, 2016, the JESSEAS II performed a voyage, from Sables d'Olonnes to Sète, South of France, under the supervision of the shipyard and accompanied by Captain Calvet.

51.     Following the initial sea trial, an initial "punch list" ("Punch List") of numerous items was established by the shipyard and Jessore, to be addressed by Privilege Marine before final delivery of the JESSEAS II.  Several iterations of the Punch List evolved over the ensuing months and covered most aspects of the yacht, including, decking, bridge and other structural elements, the mast and other equipment, the interior fixtures and fittings, as well as the various internal and external coatings, finishes and furnishings.

52.     Such yard guaranty work can take a year to complete, as it did for JESSEAS II, which also spent much time, until August 2016, performing interim voyages to and from Sète, before remaining at Sète, from August 2016 through February 2017, for completion of the warranty work and final sea trials.

53.     The warranty work was the responsibility of the yard, Privilege Marine, which made available whatever technical and design expertise was required to bring the vessel up to standard, for final delivery.

54.     Mr. Gounon appointed an independent technical expert on behalf of Jessore, in order to follow the progress of the warranty work.

55.     Among the many warranty issues raised and which by mid-January 2017 the experts reported to have been rectified, were: (1) a persistent creaking sound at the foot of the mast; (2) at times, loose rigging; (3) fissures in the aft beam; and (4) various structural issues.

56.     After refinishing the yacht's coatings, final sea trials were conducted on Monday 27, February 2017 with one of the many technical experts, an independent rigging expert

mandated by Privilege Marine and approved by the manufacturer of the mast, Lorimar, for observing the mast, setting the rigging and ensuring that Captain Calvet was well-instructed as to how in future to adjust the rigging, while underway.

57.     Privilege Marine, Lorimar and the technical experts, had been and were at all relevant times aware that, after the final sea trials, the JESSEAS II was immediately embarking on a circumnavigation of the Globe. Privilege Marine even arranged for delivery to French Polynesia of replacement rudders for the yacht.

58.     Privilege Marine, Lorimar and their independent technical experts all declared the vessel seaworthy, safe and fit for such a voyage.

59.     Mr. Gounon, aided by his technical expert, had for one year driven Privilege Marine to do whatever was required to ensure that JESSEAS II would be safe, fit and ready for his round the world voyage.

60.     The JESSEAS II was finally delivered by the shipyard to its owner, Jessore, on or about March 1, 2017.

### ***Policy Renewal For 2017***

61.     Between January 13 and March 2, 2017, Ascoma (Mior) negotiated the renewal of the Policy via Brit's placing broker (which had been acquired and traded under a new name, JLT Specialty Limited). The negotiations were still handled by Bryant, the same person who had handled the original negotiations, for the 2016 Policy.

62.     At all relevant times, Brit, JLT Specialty and Ascoma were already aware, from the prior year: (1) of the value, make, model and specifications of the JESSEAS II; and (2) that JESSEAS II was a "new build" which had to undergo its period of yard guaranty work.

63.     Ascoma (Mior) was still under Mr. Gounon's authorization to liaise with the JESSEAS II's Captain Calvet and with Privilege Marine, for any information concerning the yacht and the yard guaranty work that may be required for the renewal of the insurance.

64.     At latest by January 19, 2017, Brit, JLT Specialty and Ascoma were aware that the yard guaranty work had extended into 2017; that it had kept JESSEAS II at the French port of Sète; and as a result, the yacht had not been able to sail to the Caribbean, as planned for November 2016, which itinerary had previously been disclosed and indeed had been written into the 2016 Policy.

65.     At all relevant times, Brit was informed and fully aware of the yacht's change of itinerary and the intention for JESSEAS II to sail around the world, after leaving France; which is why Brit in the Policy expressly agreed to insure the yacht for "worldwide" navigation.

66.     At all relevant times, Brit, JLT Specialty and Ascoma were informed and aware that they had access online and/or directly from Privilege Marine or Captain Calvet, to any information regarding the yacht.

67.     Brit underwrote the Policy's risks at 100%.

68.     Brit agreed to underwrite the Policy with actual or constructive knowledge of the yard guaranty work.

69.     When it agreed to underwrite the Policy, Brit did not have any interest in nor did it rely on or avail itself of any details whatsoever of the yacht's yard guaranty work, including any non-destructive testing ("NDT") of the carbon mast, which it knew to be a feature of 7 Series models, such as JESSEAS II.

70.     The yard guaranty work was not material to Brit's acceptance of the risk and its agreement to renew the Policy for 2017.

71.   Beyond providing Brit access, via Captain Calvet and directly via Privilege Marine, to any and all matters addressed during the yard guaranty work, Jessore had no obligation and no reason to additionally and separately provide to Brit such information: (a) which according to industry practice, is not provided to insurers; and (b) which Brit and its agents, consistent with industry practice, did not pursue via Captain Calvet or Privilege Marine and had no interest in pursuing.

## THE LOSS

72.   In early March of 2017, the following sequence of events took place.

73.   On March 1, 2017, JESSEAS II departed the French Mediterranean port of Canet en Roussillon, on its round the world voyage, properly manned and crewed.

74.   On March 2, 2017, at 12:00 noon, insurance under the Policy renewed for 2017;

75.   On March 3, 2017, a Friday, just before 6:00 pm local time, off the coast of Spain, in worsening seas and winds of up to 35 knots, JESSEAS II's mast snapped, injuring one of the crew, piercing one of the catamaran's twin hulls and causing the yacht to partially submerge. Captain Calvet, the crew and passenger were rescued by helicopter, around 7:30 pm, by which time the sea had worsened and the wind had risen to 50 knots.

76.   The above incident and ensuing loss were fortuitous and are within the broad scope of Jessore's insurance under the "all risks" Policy.

77.   JESSEAS II subsequently became a constructive total loss.

78.   Such constructive total loss is payable under the Policy.

### *Loss Immediately Reported to Brit and Investigated*

79.   On March 6, 2017, the next business day following the loss, Ascoma (Mior) reported the incident and loss, via JLT, to Brit.

80.     At the same time, Ascoma (Mior) advised that he had appointed a French marine surveyor, Nicolas Dulauroy, on Brit's behalf, to survey the yacht, at Aguilas, Spain.

81.     As a result, Brit was informed, on or about March 6, 2017: (a) of Dulauroy's preliminary view that the loss was due to the faulty structure of the yacht; (b) that Captain Calvet had reported on the extensive yard guaranty work performed in 2016; and (c) the yard had made a complete check and worked on the mast and rigging prior to the yacht's departure for the voyage.

82.     Dulauroy's preliminary report to Brit, also referred to the structural problems; to the persistent creaking (which the French surveyor erroneously wrote as "cracking") at the foot of the mast and fissures in the aft beam, encountered on the yacht's initial delivery voyage from Sables d'Olonnes, in March 2016.

83.     As of March 6 and 7, 2017, or thereabouts, Brit's claims department had been made aware: (a) that the mast had snapped; (b) of Dulauroy's report regarding structural issues, mast "cracking" and extensive yard guaranty work; (c) Dulauroy's urgent call for the half submerged yacht to be refloated "ASAP".

84.     Consistent with its all risks Policy, including, Brit's specific agreement to insure against "[a]ny loss, damage or expense directly or indirectly caused by or in consequence of faulty construction and/or improper design", Brit at all relevant times considered and admitted that the loss was covered by the Policy and therefore, during April and May 2017, authorized payment of Jessore's claims for salvage, towage and other losses under the Policy.

85.     Consistent with industry practice, at all relevant times, Brit did not consider there to have been any "nondisclosure" with respect to the structural faults, mast "cracking" and

extensive yard work reported to have taken place during the year leading up to the Policy renewal.

### *French Investigative Proceedings*

86.     In May 2017, to protect its own and Brit's potential recovery (as subrogated insurers) against Privilege Marine for faulty construction and/or improper design of JESSEAS II, Jessore with Brit's concurrence, commenced an investigatory or "judicial expertise" action, in the Court of Grande Instance, in Perpignan (the "French Court" and "French Investigative Proceedings"). The French Court appointed an expert, marine surveyor, Mr. Feuillerade ("Feuillerade") to investigate and report on the alleged construction defects of the JESSEAS II, the ensuing losses and to quantify damages.

87.     Brit in response appointed English solicitors, Clyde & Co. LLP, and French counsel, Hervé Laroque, to monitor and keep it informed about the French Investigative Proceedings.

88.     Feuillerade has issued several interim reports, but not yet his final report ("Final Report").

89.     Feuillerade's interim reports have analyzed in detail the possible causes of the JESSEAS II's mast collapse, all of which are covered and none of which is excluded from the risks and losses covered under the Policy.

90.     Feuillerade is also analyzing the extent that Brit or those for whom Brit is responsible, in relation to the salvage and maintenance of JESSEAS II, were negligent and caused or aggravated the loss and damage to JESSEAS II, following the accident.

91.     Feuillerade has also determined that the costs of repairs of the yacht would exceed its agreed value, which corroborates that JESSEAS II was a constructive total loss, under the Policy.

### *Brit's Initial Acceptance of Jessore's Claims Under the Policy*

92.     During March through May 2017, Brit accepted Jessore's claims under the Policy, among other things, for the salvage charges (€84,993.31), towage of JESSEAS II back to France (€39,600), for repairs and to expedite any possible recovery action against Privilege Marine; and for claims related to the crew and personal injury.

93.     Brit's foregoing conduct, including, its acceptance of Jessore's claims is an admission: (a) of Brit's liability for Jessore's loss under the Policy and (b) Brit's resulting intention to pursue recovery against Privilege Marine, for faulty construction and/or design of JESSEAS II.

94.     Thereafter, Jessore and Brit became aware from the surveyors and/or French Investigative Proceedings that JESSEAS II had suffered more extensive damage and had become a constructive total loss, due to the cost of repairing exceeding the value insured under the Policy.

95.     On June 21, 2017 and again on August 30, 2017, Brit's English solicitors, Clyde & Co. LLP, advised that they had been retained by Brit and reserved Brit's position "with regard to coverage and liability".

96.     Such reservations by Brit's attorneys were after Brit had accepted and paid Jessore's initial claims and are ineffective to reverse Brit's earlier admission and waivers with respect to the validity of Jessore's claim.

### *Brit's Bad Faith Denial of the Claim After Ending its Yacht Insurance Business*

97.     At all relevant times, Jessore pressed Brit to make payment of its claim, but Brit continually asked for more time to respond to Jessore's claim, on the pretext of awaiting the Final Report of the French Court's expert into the cause of the mast collapse.

98.     At all relevant times, Brit required Jessore's cooperation in relation to the French Investigative Proceedings and requested Jessore not to commence suit against Brit before the issuance of the Final Report, erroneously claiming that until the cause of the loss was known, Brit could not know if the loss was insured or excluded under the Policy's exclusions.

99.     On June 5, 2019, more than two years after receiving Mior and Dulauroy's reports about the loss and its probable causes, and after Brit had accepted and paid Jessore's initial claims under the Policy (salvage, towage, crew personal injury, etc.), Brit for the first time alleged to Jessore that there may have been "an element" of nondisclosure by Jessore, because as Brit incorrectly alleged, Jessore had concerns with the mast prior to the loss "but nothing was done to remedy their fears".

100.     On information and belief, all that had changed during the intervening two years, to June 2019, to make Brit change its mind about the obvious merit of Jessore's claim, was that Brit internally had made the decision to exit from the business of selling yacht insurance.

101.     As a result, Brit's "book" of business was placed in "run-down", as it tried to minimize and avoid paying claims, including Jessore's, resulting from its yacht business.

102.     By letter dated November 29, 2019, Brit denied Jessore's claim and belatedly alleged the following baseless defenses under the Policy: (1) that the Policy, commencing March 2, 2017 was void *ab initio*, for nondisclosure and/or misrepresentation by Jessore, prior to and during Policy renewal in 2017: (a) of material facts (namely, the yard guaranty work and other matters to which Brit had all along had access; which were also reported to Brit immediately

following the loss, by Mior and Dulauroy; and had all along been the subject of the May 2017 French proceedings against Privilege Marine); and (b) that JESSEAS II was a "prototype", being "the first" of a new series of catamaran, "the 7 Series" and that there had been nondisclosure as to the particulars of the yacht; (2) reserving the right "to rely, if necessary" on the one-year time bar in Form R12 (despite Brit, at the relevant time and for two years, representing to Jessore that delay was required, for Brit to assess whether it should pay Jessore under the Policy); and (3) under Policy Exclusion 1 of Form R12 (excluding "inherent vice"), to the extent it may be determined that the mast failure resulted from "inherent defects" in "mast" or "structure". ("Declination Letter").

103.    In its Declination Letter, for its allegations of misrepresentation and nondisclosure, Brit referred to and relied, among other things, on the very same events referred to by Mior and Dulauroy, two years nine months earlier (including the "cracking" of the mast), which Brit appears to have copied from their reports.

104.    Brit's above allegations are baseless and made in bad faith, to evade its obligation to pay Jessore €4,274,000 under the Policy.

## FACTUAL CONCLUSIONS

105.    Jessore at all relevant times complied with the terms of the Policy.

106.    Jessore at all relevant times satisfied all conditions to and for coverage under the Policy.

107.    Jessore at all relevant times satisfied all pre-requisites and requirements for bringing a claim under the Policy.

108.    Jessore timely brought its claim and instituted suit under the Policy.

109.     Jessore is entitled, among other things, to payment under the Policy of €4,274,000 for its loss of the JESSEAS II. Jessore reserves all rights to determine the amount of damages in U.S. dollars based on the applicable exchange rate.

110.     Brit waived its right, if any existed (which is denied), to deny Jessore's claim.

111.     If, which is denied, Form R12's one-year time bar was incorporated into the Policy, Brit nevertheless, has no right to rely on it due to the following, among other things: (a) pre-emption by applicable French insurance law, regulation or insurance claims practice, under which the time bar runs two years from the Final Report of the court-appointed expert, in the French Investigative Proceedings; (b) pre-emption by agreement between Brit's agent Ascoma and Jessore that the French time bar applied to Jessore's claim; (c) agreement by Brit's French counsel, Hervé Laroque, to toll the running of any time bar until issuance of the Final Report by the French Court-appointed expert; (d) Brit's waiver of any time bar; and/or (e) estoppel and unfairness, among other things from Jessore's reliance on the representations and conduct of Brit that the one-year time bar did not apply and/or start to run until the Final Report, or at all.

112.     Jessore disclosed and made available to Brit all information known regarding JESSEAS II.

113.     There was no nondisclosure or misrepresentation by Jessore to Brit of any material fact in connection with the Policy.

114.     Ascoma and JLT Specialty Ltd. at all relevant times were agents for Brit, with respect to information that Jessore provided and made available to or via them regarding JESSEAS II.

115.    At all relevant times prior to departure from France, on March 1, 2017, Privilege Marine, Lorimar and the independent experts declared JESSEAS II to be in every way seaworthy, fit and safe for its round the world voyage.

116.    Jessore and Mr. Gounon devoted diligence, time, technical expertise and expense to ensuring that Privilege Marine and Lorimar made JESSEAS II in every way seaworthy, fit and safe for Mr. Gounon's family and friends to make the round the world voyage.

117.    Jessore and Mr. Gounon at all relevant times were strongly motivated by concerns for the safety of crew, family and friends, to minimize every risk to the yacht, in contrast to the underwriting standards and practices prevalent among yacht underwriters and Brit, which was and is motivated by purely commercial considerations.

118.    All reported possible causes of the mast collapse and loss, are covered by the Policy's broad "all risks" insurance.

119.    There is no exclusion for "inherent defect" or other defense, under the Policy.

## FIRST CAUSE OF ACTION

120.    Jessore repeats and realleges paragraphs 1 through 119 hereof, as if fully set forth.

121.    Brit's failure to fully indemnify Jessore for its loss is a breach of its insurance contract and its obligations under the Policy.

122.    Consequently, Jessore is entitled to a declaration that Brit is liable to Jessore under the Policy in the sum of €4,274,000, plus interest and costs.

## SECOND CAUSE OF ACTION

123.    Jessore repeats and realleges paragraphs 1 through 122 hereof, as if fully set forth.

124.    As Brit's agent for such purposes, Ascoma and Mior's actual and/or constructive knowledge of and access to information relating to JESSEAS II must be imputed to Brit.

125.    Consequently, Jessore is entitled to judgment declaring Ascoma and Mior to be Brit's agent for such purpose and that their actual and/or constructive knowledge of and access to information relating to JESSEAS II must be imputed to Brit.

### THIRD CAUSE OF ACTION

126.    Jessore repeats and realleges paragraphs 1 through 125 hereof, as if fully set forth.

127.    The delays of Brit or those for whom Brit is responsible in relation to the salvage and maintenance of JESSEAS II were negligent and/or in breach of the Policy.

128.    Such negligence and/or breach of contract caused or aggravated the loss and damage to JESSEAS II.

129.    Consequently, Jessore is entitled to a declaration that Brit is liable to Jessore under the Policy to compensate for such loss or aggravation of loss, in a sum to be determined at trial, plus interest and costs.

### FOURTH CAUSE OF ACTION

130.    Jessore repeats and realleges paragraphs 1 through 129 hereof, as if fully set forth.

131.    Coverage under the Policy for Jessore's loss is clear from the express language of the Policy, including, the broad "all risks" scope of the insurance.

132.    Despite Jessore's clear entitlement and Brit's early admission that Jessore's claims were payable, Brit delayed and refused payment due under the Policy.

133.    Brit's refusal to pay was motivated by the fact that it exited the business of insuring yachts and sought to run down its yacht division with the minimum of cost and by minimizing its payment of legitimate claims to insureds, such as Jessore.

134.    Brit had no reasonable basis for so delaying and denying Jessore's claim and Brit knew or should have known this fact. For example: (a) Brit knew from its own underwriting

practices as well as its own initial acceptance of Jessore's claims that it had no good faith defense under the Policy, based on nondisclosure; (b) nevertheless, to try to create a defense via the French language personnel of Jessore and Ascoma, and knowing that Jessore would feel compelled to cooperate, Brit issued numerous unwarranted and at times duplicative demands for records relating to the yard guaranty work and – despite having its own counsel to keep it fully advised as to such records from the French proceedings – Brit caused further delay in order to translate such documentation from French; and (c) at the same time, knowing that Ascoma and Jessore would be adhering to French claims handling practices, Brit and its French counsel prevailed on Jessore not to commence suit, on the pretext of awaiting the Final Report so that Brit could assess whether it should pay Jessore's claim, only to then turn round after two years and nine months, and assert that Jessore's claim had long been time barred.

135.    Brit's foregoing conduct is a breach of its obligation of good faith and fair dealing, which proximately caused Jessore loss and damage separate from and in addition to its above claims for reimbursement of losses insured under the Policy, for which Jessore is entitled to recover compensation from Brit, including, without limit the following, in amounts to be proven at trial:

> a)    Jessore has been compelled to incur the administrative time, costs and expenses, including legal expenses, of the ongoing proceedings against Privilege Marine, in France, which it would not have had to incur if Brit had paid the loss as required under the Policy and then assumed responsibility for all such expenses, after becoming subrogated to Jessore's claims in those proceedings;

{NY227703.1 }                                    24

b)      the fact that Jessore has been deprived of its €4,274,000 insurance proceeds and thus forced to bear the finance burden from Brit's bad faith delays and non-payment;

c)      that such nonpayment of the insurance funds, compelled Jessore to forego other opportunities, including, most notably, the purchase, use and enjoyment, over several years, of a replacement yacht for JESSEAS II, such loss of use being currently estimated to be in the sum of €927,000, annually; and

d)      To the extent Brit carries through with its threat to pursue recovery against Jessore for sums which Brit paid, when it initially admitted Jessore's claims under the Policy, Jessore will suffer additional damage, for which it reserves the right to claim compensation.

**WHEREFORE**, Plaintiff Jessore Management SA prays that Judgment may be entered in favor of plaintiff against defendant, as follows:

a)      Declaring that Brit is liable to indemnify Jessore under the Policy in the sum of €4,274,000, plus pre and post judgment interest and costs;

b)      Declaring Ascoma and Mior to be Brit's agent for informational purposes and that their actual and/or constructive knowledge of and access to information relating to JESSEAS II must be imputed to Brit.

c)      For the amount of Jessore's damages as may be proven at trial to have been caused by Brit's delay in salvaging and/or its failure to maintain JESSEAS II, following the accident, including aggravation of the damage

to the yacht and loss of use of the yacht, at a rate of €927,000, annually or such other amount as may be proven;

d)     Awarding Jessore its additional damages, to be proven at trial, caused by Brit's bad faith conduct, as detailed above in the Fourth Cause of Action, including without limit, loss of use of an equivalent yacht, at a rate of €927,000, annually; and

e)     That this Court grant to Plaintiff such other and further relief as may be just.

Dated: New York, New York
        July 28, 2020

HILL BETTS & NASH LLP

By:     /s/ *James D. Kleiner*_____
        James D. Kleiner
        *Attorneys for Plaintiff Jessore Management SA*
        14 Wall Street
        New York, New York 10005
        Tel. No: (212) 839-7000
        E-mail: jkleiner@hillbetts.com

        &

NICOLETTI HORNIG & SWEENEY

By:    /s/ *Carole Rouffet*_____
        Carole Rouffet
        *Attorneys for Plaintiff Jessore Management SA*
        88 Pine Street, 7th Floor
        New York, New York 10005
        Tel. No: (212) 220-3830
        E-mail: crouffet@nicolettihornig.com